899 A.2d 1009 (2006)
386 N.J. Super. 162
STATE of New Jersey, Plaintiff-Respondent,
v.
Shihaab LOYAL, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 16, 2006.
Decided June 12, 2006.
Jodi L. Ferguson, Acting Deputy Public Defender II, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Ms. Ferguson, of counsel and on the brief).
Lucille M. Rosano, Special Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Essex County Prosecutor, attorney; Ms. Rosano, of counsel and on the brief).
*1010 Before Judges WEFING, WECKER and FUENTES.
The opinion of the court was delivered by
WEFING, P.J.A.D.
Defendant was indicted for murder, N.J.S.A. 2C:11-3(a)(1),(2); felony murder, N.J.S.A. 2C:11-3(a)(3); attempted robbery, N.J.S.A. 2C:15-1; attempted murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:5-1; aggravated assault, N.J.S.A. 2C:12-1(b)(1); possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and two counts of unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). Tried to a jury, defendant was convicted of aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1)[1], as a lesser-included offense of murder and found not guilty of felony murder and attempted robbery. He was convicted of the balance of the charges. The trial court sentenced defendant to twenty-five years in prison for aggravated manslaughter and twenty years in prison for attempted murder. The trial court directed defendant to serve these terms consecutively; both were subject to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2. The trial court also merged the conviction for aggravated assault into the conviction for attempted murder and made the terms for the weapons' convictions concurrent. Defendant has appealed his convictions and sentence. After reviewing the record in light of the contentions advanced on appeal, we have concluded defendant's convictions must be reversed and the matter remanded for a new trial.
In the early morning hours of May 17, 2000, Khalfani Slue was standing on Vermont Avenue in Newark, talking with Gregory Mark Dubbissette. Both young men lived on Vermont Avenue, and Slue had been waiting for his girlfriend to come out from a nearby house. While the two were talking, another friend, Carlton Elliott, pulled up in his car to pick up his girlfriend. He remained in his car, and Slue and Dubbissette went over to talk with him. Another car then pulled up and a passenger asked Dubbissette and Elliott if they had any marijuana; they replied they did not, but the man persisted, asking if they knew where he could purchase some. Slue later identified the defendant as this man. There was testimony that this second car pulled to the side of the street and parked, and the occupants, including Kalief and Lonnie Spruiel and Jihad Lassiter (sometimes referred to as Jihad Green), began to get out of the car.
Slue became concerned that he was about to be robbed and he and Dubbissette ran and got into Elliott's car, Slue in the front passenger seat, Dubbissette in the rear, and yelled for him to drive away. As Elliott pulled out, gun shots rang out. Both Slue and Dubbissette were shot. Elliott drove them directly to the hospital, where Dubbissette died later that night. Although a bullet struck Slue in the head, he survived and was discharged from the hospital several days later.
Slue could not see who was firing, but Lassiter later testified that defendant had a gun with him that night and fired the shots. Lassiter also testified that when they all got back into the car, defendant pointed his gun at Kalief Spruiel's head and said, "if you say anything, I'll shoot you." Kalief and Lonnie Spruiel gave statements to the police to the effect that they had seen defendant shooting a gun and that defendant, on re-entering the car, had threatened to shoot Kalief. At trial, however, they testified they had not seen defendant with a gun and said defendant had not threatened Kalief.
*1011 Police responded to the scene of the shootings. They canvassed the area and recovered four spent .380 shell casings.
Several days later, on the evening of May 22, the Newark police stopped a car that bore marks as if its locks had been pried open. Defendant was the driver; Alterique Robinson and Corey Webb were his passengers. They had earlier stopped at a liquor store and purchased a bottle of gin, which they were drinking as they were driving. Lieutenant O'Connor of the Newark Police Department testified that he approached the car and asked defendant for his license and registration. He said he was using a flashlight and that when he directed it into the car, he saw the open bottle of gin and two cups. Lt. O'Connor testified that the center console of the car was partly open and that he saw "two colored eyes staring at me." He thought it was a toy in the console and then immediately realized they were the reflective night sights of a real gun. The men were ordered out of the car, and the gun was seized. Ballistics tests later linked the gun to the May 17 shootings in Newark. The prosecution sought to link defendant to the gun through the testimony of Webb and his then-girlfriend, Monique Daniels.
Defendant presented one witness, Michael Petrillo, an investigator retained by defense counsel. Mr. Petrillo testified that he tried to interview Khalfani Slue but that Mr. Slue refused to discuss the incident with him beyond saying that the statement he had provided to the police department was incorrect.
On appeal, defendant raises the following arguments:

POINT I DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED WHEN THE TRIAL COURT INSTRUCTED THE JURY TO DISREGARD DEFENSE COUNSEL'S CLOSING ARGUMENT THAT THE STATE HAD FAILED TO CARRY ITS BURDEN OF PROVING THE OFFENSES "BEYOND A REASONABLE DOUBT" BECAUSE IT FAILED TO PRODUCE SUFFICIENT CREDIBLE EVIDENCE CONNECTING DEFENDANT TO THE GUN.

POINT II THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON THE ISSUE OF HOW TO EVALUATE SEVERAL OF THE DEFENDANT'S ORAL STATEMENTS DENIED THE DEFENDANT HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW. (U.S. CONST. AMENDS. V, VI AND XIV; N.J. CONST. (1947), ART. I, PARS. 1, 9 AND 10). (Not Raised Below).

POINT III TESTIMONY FROM STATE WITNESS MONIQUE DANIELS THAT SHE COULD NOT "COUNT HOW MANY TIMES" SHE SAW DEFENDANT WITH A GUN, DENIED DEFENDANT A FAIR TRIAL, IN VIOLATION OF N.J.R.E. 404(b). (Not Raised Below).

POINT IV BECAUSE THE LIEUTENANT'S TESTIMONY WAS NOT CREDIBLE, THE COURT ERRED IN RELYING ON THAT TESTIMONY IN DETERMINING THAT THE SEIZURE OF THE GUN WAS JUSTIFIED UNDER THE PLAIN VIEW EXCEPTION TO THE WARRANT REQUIREMENT.

POINT V DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS BY THE TRIAL COURT'S REFUSAL TO GRANT HIS MOTION FOR A PRETRIAL HEARING PURSUANT TO UNITED STATES V. WADE.

*1012 POINT VI DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE.
A. The Court Abused its Discretion by Running the Aggravated Manslaughter Conviction Consecutively to the Attempted Murder.
B. The Aggregate Sentence Was Manifestly Excessive.

POINT VII THE SENTENCE IMPOSED BY THE COURT IS ILLEGAL BECAUSE IT VIOLATES DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHT TO A TRIAL BY JURY AND DUE PROCESS OF LAW. U.S. CONST. AMENDS. VI AND XIV; N.J. CONST. (1947), ART. I, PARS. 1, 9 AND 10. (Not Raised Below).
Defendant's first argument revolves around an incident that occurred in connection with defense counsel's summation. In the course of that summation, he discussed the retrieval of the handgun from the console on May 22 and stated the following:
Do the words "fingerprints" ring a bell? Do you have any evidence whatsoever about fingerprints? Do you have any evidence about Mr. Loyal's fingerprints on that gun? Do you have any testimony about Mr. Loyal's fingerprints on that nice, smooth, flat clip into which remember the ballistics expert kind of showed us how you load the clip, you've got to hold it and you've got to push the bullets in? And you've got to leave fingerprints. Do you have any testimony that Mr. Loyal's prints are on that gun, on that clip, never mind the bullets? Reasonable doubt comes from the evidence, and it comes from the lack of evidence. This is a murder case. And you have no prints.
The prosecution neither made an objection nor attempted to respond in its summation. Neither did it request a curative instruction of any sort. The trial court, however, included the following remarks in its charge to the jury:
[S]peculation or conjecture or other forms of guessing play no role in the performance of your duty. Let me give you an example of speculation. There were discussions here and during the trial about fingerprints on the gun. Now, I wouldI think it's fair to say that none of you have any expertise in the handling or lifting of fingerprints other than what you might have seen on television. You have no special knowledge in that regard.
We have no evidence as to whether there were fingerprints on the gun, could have been fingerprints on the gun, whether or not anybody touched the gun, did not touch the gun, whether or not anything would have come up on the gun. You have no way of knowing. To draw conclusions [of] what may or may not have been on that gun is speculation. You simply don't know. It shouldn't enter into your decision in any way.
You may, of course, consideryou're free to consider whether or not there's any proof that the State even examined the gun, and whether or not that is a reflection of whether the State did a complete job in the investigation, or they did not.
Defendant's attorney objected, but the trial court overruled his objection.
Before proceeding to consider the substance of defendant's argument, we consider it important to set forth earlier discussions during the trial on the question of fingerprints. Prior to opening statements, in response to the court's query whether any issues had to be addressed before openings, defense counsel raised the question of the sufficiency of the report served by the State by the individual who had examined the gun for fingerprints. That *1013 report merely stated, "after a further examination of the above-mentioned weapon, my findings of the evidence submitted was of insufficient evidentiary value." Defense counsel complained that from that letter, he did not know what tests, if any, were performed, whether prints were recovered that did not match defendant's, whether prints were recovered but were not of sufficient quality to permit a match, or whether the weapon contained no prints at all. During the course of the colloquy, defense counsel stated, "as this stands, I should be free to argue that Mr. Loyal's prints were not on the weapon." The trial court indicated some uncertainty about this statement, noting that, in its view, the expert's statement did not permit a conclusion that defendant's fingerprints were not on the gun. Counsel were instructed not to mention fingerprints in their openings, and the matter was put off for a later date, to determine to what, if anything, the expert could testify.
The question was addressed again, several days later. Defense counsel again complained he was unable to determine from the expert's report what tests were performed and what the expert meant by the statement "insufficient evidentiary value." There were several references in colloquy between the trial court and the attorneys to having the expert appear, and at one point, the trial court directed the prosecution to have the expert appear that afternoon for a Rule 104 hearing. There is no indication in the record supplied to us, however, that such a Rule 104 hearing ever took place or that the question of fingerprints was substantively addressed again until defense counsel's remarks in his summation.
With that background, we take up the question of the propriety of defense counsel's remarks and the effect of the manner in which the trial court responded. Counsel have not referred us to, and our research has not disclosed, a published opinion in New Jersey directly addressing the propriety of counsel referring in summation to the failure of the prosecution to present fingerprint evidence. Courts in other jurisdictions have reached contrary conclusions on the question. Compare U.S. v. Thompson, 37 F.3d 450 (9th Cir. 1994) (trial court committed prejudicial error when it precluded defendant from commenting on lack of fingerprint evidence), U.S. v. Hoffman, 964 F.2d 21, 24 (D.C.Cir.1992)(noting that "it would not have been improper for defense counsel to point out to the jury that the government had not presented any evidence concerning fingerprints" (quotation marks and citation omitted)), U.S. v. Poindexter, 942 F.2d 354, 358-60, 363 (6th Cir.), cert. denied, 502 U.S. 994, 112 S.Ct. 615, 116 L.Ed.2d 637 (1991) (trial court committed reversible error as to one defendant in sustaining objection to comment in summation about the absence of fingerprints and in telling jury that it was "improper to argue the absence of fingerprints proves anything[;]" court committed harmless error as to the co-defendant in light of overwhelming evidence of his guilt), and Eley v. State, 288 Md. 548, 419 A.2d 384, 386 (Md.1980)(trial court committed prejudicial error when it precluded defense counsel from arguing in summation based upon the prosecution's "unexplained failure to produce fingerprint evidence"), with State v. Davidson, 351 N.W.2d 8, 12-13 (Minn.1984)(in the absence of any evidence that gun had been dusted for fingerprints, trial court properly prevented defense counsel from commenting in summation on the failure to produce fingerprint evidence), State v. Holmes, 389 S.W.2d 30, 34 (Mo.1965), aff'd, 428 S.W.2d 571 (1968) (no error by the trial court in sustaining the prosecution's objection to defense counsel's comment in summation that the jury should draw an unfavorable inference from the State's failure *1014 to take fingerprints from the scene), People v. Turner, 212 A.D.2d 818, 623 N.Y.S.2d 271, 272 (N.Y.App.Div.), leave to appeal denied, 86 N.Y.2d 742, 631 N.Y.S.2d 623, 655 N.E.2d 720 (1995) (holding that the trial court "properly prevented defense counsel from raising the issue of fingerprint evidence during summation since there was no testimony at trial concerning fingerprints or the lack thereof"), Commonwealth v. Wright, 255 Pa.Super. 512, 388 A.2d 1084, 1086 (1978) (holding that trial court properly sustained objection to defense counsel's commenting in summation on the absence of fingerprint evidence), and State v. Emerson, 149 Vt. 171, 541 A.2d 466, 469-70 (1987) (holding improper defense counsel's comment in summation that "[t]here was no evidence presented by the State that the fingerprints on the knife were smudged or of such a quality that comparison could not be made.... [T]here's been no evidence as to whose print that was[,]" because there was no evidence before the jury that the print was readable).
We consider the cases cited that have stated reasons for precluding defense counsel from commenting in summation on the absence of fingerprint evidence to be distinguishable from the present matter. In Commonwealth v. Wright, for instance, defense counsel attempted to argue that the absence of fingerprints was exculpatory, that is, the prosecution's failure to produce fingerprints entitled defendant to an inference such evidence would exculpate him; he did not confine his remarks merely to contending that the State had not met its burden of proof. Wright, supra, 388 A.2d at 1086. State v. Holmes is similar. In that case, defendant did not restrict his argument to whether the State had met its burden of proof, but went further and attempted to argue that the jury should draw an unfavorable inference from the State's failure to produce fingerprint evidence. Holmes, supra, 389 S.W.2d at 34. In State v. Davidson, there was no evidence on the question whether the gun defendant was convicted of possessing had been dusted for fingerprints. Davidson, supra, 351 N.W.2d at 12. Here, although there was no direct evidence on the question, there was testimony that the gun recovered had been submitted to the unit responsible for such dusting and, although the jury was never aware of it, the letter the State submitted as an expert report made clear that the gun had, in fact, been tested for fingerprints.
Although, as we have noted, there is no reported New Jersey case directly addressing the issue, there are two cases which, in our judgment, indicate that if our Supreme Court were confronted with the question, it would consider the comments made by defense counsel to be proper argument. In State v. Grice, 109 N.J. 379, 381-82, 537 A.2d 683 (1988), defendants were convicted by a jury of kidnapping, two counts of aggravated sexual assault and of aggravated assault; they were also convicted of robbery, receiving stolen property, theft, and attempted sexual assault. During the summation of one of the defense counsel, the following incident occurred:
COUNSEL: Let's look at the scientific evidence
PROSECUTOR: Objection. Your Honor, there was evidence available to defense counsel and I have no objection to defense counsel bringing something in he didn't bring in
THE COURT: There was no scientific evidence in this case and either party had the opportunity if they so desired to have scientific evidence and neither party chose to do so and, therefore, [counsel], do not comment upon scientific evidence.
COUNSEL: That's what I was going to say. There is no scientific evidence.

*1015 Ladies and gentlemen, there is no scientific evidence that was presented to you by the prosecution.
PROSECUTOR: Objection.
THE COURT: There was no scientific evidence presented by either the prosecution or defense counsel and the statement of defense counsel is not a proper comment. There is no scientific evidence involved in this case. If either party wanted to bring scientific evidence into this case, they should have done so and neither party did, to my recollection.
Proceed.
[Id. at 387, 537 A.2d 683.]
Later, co-defendant's attorney stated in his summation:
[A]s the Judge has told you and as Miss Cooper has indicated, there has been no scientific evidence of either the defense or the prosecution but, the prosecution brought in Detective Dillon to tell you that what was on those floor mats was blood. How does Detective Dillon know that's blood? Because it's red, he says it's blood? Ladies and gentlemen, that's what we mean by proving beyond a reasonable doubt, that what it means is the State had to prove their case to you beyond a reasonable doubt. Defense doesn't have to prove anything to you.

These defendants stand before you innocent until you determine whether or not they committed the crime which is alleged by the prosecution. So the Judge may instruct you that we have the right to bring scientific evidence forward and Miss Cooper may indicate that we have the right to bring scientific evidence forward but, what did the State bring forward to you? The only thing that the State brought forward was [the victim], Detective Dillon and then anything else was a smoke screen. (Emphasis added.)
[Id. at 387-88, 537 A.2d 683.]
The Court concluded that this second argument, combined with accurate instructions, obviated any prejudice that might have attached to the trial court's initial remarks, which could convey the impression that defense counsel had an obligation to present scientific evidence. Id. at 389, 537 A.2d 683. The Court in its opinion never indicated that it would be improper for defense counsel to remind the jury about the absence of scientific evidence.
In State v. Baker, 270 N.J.Super. 55, 69, 636 A.2d 553 (App.Div.), aff'd, 138 N.J. 89, 648 A.2d 1127 (1994), we considered, inter alia, a defendant's contention that his trial counsel had been ineffective for not pointing out in his summation that the State had not presented any fingerprint evidence tying him to the crime. We rejected his argument, not because we viewed such comments as improper but because, having reviewed the record, we were satisfied that there was "no reasonable probability that this line of argument would have changed the outcome of the trial." Ibid.
We have no such confidence here. Although the State had a strong case, it was by no means overwhelming. The credibility of various witnesses was certainly subject to question, as we shall set forth in more detail below.
The State has referred to State v. Shelton, 344 N.J.Super. 505, 782 A.2d 941 (App.Div.2001), certif. denied, 171 N.J. 43, 791 A.2d 221 (2002), to support its position that counsel may only comment on fingerprint evidence when such evidence is presented at trial. In our judgment, Shelton does not stand for that proposition. In that case, defendant argued on appeal that certain comments by the prosecutor in her summation regarding fingerprint evidence were improper. Id. at 519, 782 A.2d 941. We rejected that contention, noting that the prosecutor's remarks, one, were supported by the evidence and, two, responded *1016 to comments made by defense counsel during summation. Ibid. We cannot extrapolate from that the conclusion urged by the State.
The right to comment on the lack of fingerprint evidence is, of course, not without limits. Thus, without evidence to support the contention, defendant cannot argue that the failure to obtain fingerprints did not comply with good police practice, or that if fingerprints had been obtained, they would have exculpated defendant. Hoffman, supra, 964 F.2d at 24-25. We concur with the views expressed by the Maryland Court of Appeals, that if "the State fail[s] to produce [fingerprint] evidence and fail[s] to offer any explanation for that failure ... it is not unreasonable to allow the defendant to call attention to its failure to do so." Eley, supra, 419 A.2d at 387.
Further, we cannot help but notice that the State made no objection to defense counsel's remarks and, further, made no attempt in its summation to respond to the remarks. We have, in appropriate instances, noted that an absence of objection by defense counsel to a prosecutor's summation may indicate that counsel perceived no prejudice. State v. Frost, 158 N.J. 76, 83, 727 A.2d 1 (1999); State v. Vasquez, 265 N.J.Super. 528, 560, 628 A.2d 346 (App.Div.), certif. denied, 134 N.J. 480, 634 A.2d 527 (1993); State v. Jang, 359 N.J.Super. 85, 96, 819 A.2d 9 (App.Div.), certif. denied, 177 N.J. 492, 828 A.2d 919 (2003). Such a conclusion is equally appropriate here.
We do not mean to suggest, on the other hand, that the trial court is, absent objection, powerless to intervene in the face of a clearly improper argument or question.
We have long since receded from the arbitrary and artificial methods of the pure adversary system of litigation which regards the opposing lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed.
[State v. Riley, 28 N.J. 188, 200, 145 A.2d 601 (1958) (citations omitted), cert. denied, 359 U.S. 313, 79 S.Ct. 891, 3 L.Ed.2d 832 (1959).]
New Jersey does not "accept[] the sporting theory of justice . . . ." Polulich v. J.G. Schmidt Tool Die & Stamping Co., 46 N.J.Super. 135, 142, 134 A.2d 29 (1957). "Indeed, it is often [the trial judge's] obligation to act when counsel do not object, or when they acquiesce, or even over the objection of both counsel...." Id. at 143, 134 A.2d 29. The duty of the trial court in this regard is not lessened in a criminal trial. In such a trial,
[t]here is a third party involved (represented by the jury): the State itself, on behalf of its citizens.... The judge is more than a referee between contestants. He is the law's representative, and it is his duty to see that the will of the law is done. The real function of the adversary system is to help him fulfill that duty.
[State v. Powell, 84 N.J. 305, 319, 419 A.2d 406 (1980), certif. denied, 87 N.J. 332, 434 A.2d 81 (1981).]
Such intervention, however, should generally take place at the time of the conduct involved. Here, defense counsel received no warning that the court considered his remarks improper until the court's instructions to the jury. Further, we cannot disregard the fact that the record presented to us contains no indication that the question of fingerprint evidence had been resolved definitively prior to summations. Indeed, we infer from the absence of the prosecutor's objection that no ruling in either regard had been made. Certainly the trial court, in overruling defense counsel's objection to his instructions, never indicated that it considered *1017 the remarks to have violated a previous ruling made during trial.
Having concluded that defense counsel's remarks were proper, we must face whether the trial court's actions can be deemed harmless. There is "no mathematically precise formula for deciding whether a trial error creates a reasonable doubt that would not otherwise have existed concerning defendant's guilt." State v. Branch, 182 N.J. 338, 353, 865 A.2d 673 (2005). In our judgment, the error cannot be deemed harmless.
The evidence linking defendant to the murder weapon came from Corey Webb and Monique Daniels, who both testified that they had seen defendant in possession of the weapon prior to the shooting. The strength or weakness of this testimony must be measured, however, in the overall context of the trial. Webb was in the car when the gun was recovered, and it was to his advantage to inculpate defendant and insulate himself from the weapon. He admitted in cross-examination that he told the police the gun belonged to defendant after he was told that it had been tied to the shooting and he would be charged with murder. Webb had, in addition, two prior criminal convictions, one for unlawful possession of a weapon and one for possession of a controlled dangerous substance with intent to distribute. Further, Webb had lied to the police in connection with an earlier incident in which he accidentally shot himself. He told the police he had been shot during a robbery in order to protect himself from a charge of unlawful possession of a handgun. The police ultimately discovered the truth, and he was prosecuted.
Monique Daniels also testified that she had seen defendant with a handgun before the shooting. Ms. Daniels, however, was Webb's girlfriend at the time, and she admitted that she was seeking to protect Webb from further charges.[2]
Khalief and Lonnie Spruiel, who were with defendant on the night of the shooting, originally told the police that defendant had fired the shots. At trial, they recanted those statements, saying they were wrong. Jihad Lassiter had also been with defendant and the Spruiels; he also gave a statement identifying defendant as the shooter and testified to that effect at trial. Lassiter, however, had four prior convictions, for offenses ranging from possession of a controlled dangerous substance with intent to distribute to unlawful possession of a handgun to escape. He also admitted that he had a very close personal relationship with the Spruiels, whom he had known for many years, but that he was merely an acquaintance of defendant's. Lassiter was serving a state prison term at the time of his testimony and also admitted that he hoped that his cooperation in this case would lead to an earlier parole date.[3]
Finally, neither Khalfani Slue nor Carlton Elliott could identify the individual who shot at them as they fled in Elliott's car.
*1018 While it is entirely possible the jury could reach the same result if defense counsel had been permitted to make his argument without the impact of the trial court's curative instruction, we cannot conclude that the error here did not have the capacity to lead the jury "to a result it otherwise might not have reached." State v. Daniels, 182 N.J. 80, 95, 861 A.2d 808 (2004) (quotation marks and citation omitted). We thus reverse defendant's convictions and remand the matter for a new trial. It is unnecessary to address defendant's remaining contentions.
Reversed and remanded.
NOTES
[1] The judgment of conviction erroneously refers to N.J.S.A. 2C:11-4(b)(1).
[2] During the course of her testimony, Daniels stated, "I can't count like how many times I seen him with a gun." Defendant made no objection at the time but raises this testimony as an additional ground entitling him to a new trial. It is not necessary for us to address the matter in detail in light of our conclusion that the matter must be remanded for a new trial. We trust that this testimony will not be repeated in the future.
[3] At the time Jihad Lassiter testified, he was in custody for another matter. He appeared before the jury in prison garb and, although his shackles were removed, he testified in handcuffs. We express no opinion on the impact, if any, of State v. Russell, 384 N.J.Super. 586, 895 A.2d 1163 (App.Div.2006), on this procedure.